# Illinois Official Reports

## Appellate Court

---

### *In re Commitment of Evans*, 2021 IL App (1st) 192293

---

| | |
|---|---|
| Appellate Court Caption | *In re* COMMITMENT OF BASHIRO EVANS, (The People of the State of Illinois, Petitioner-Appellee, v. Bashiro Evans, Respondent-Appellant). |
| District & No. | First District, First Division<br>No. 1-19-2293 |
| Filed | June 7, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-CR-80009; the Hon. Michael R. Clancy, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael R. Johnson, Kate E. Levine, Ian C. Barnes, and Logan C. Bierman, of Johnson & Levine LLC, of Chicago, for appellant.<br><br>Kwame Raoul, Attorney General, of Chicago (Jane Elinor Notz, Solicitor General, and Michael M. Glick and Mitchell J. Ness, Assistant Attorneys General, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Presiding Justice Walker and Justice Coghlan concurred in the judgment and opinion. |

**OPINION**

¶ 1    Between 1993 and 2007, Bashiro Evans was in and out of prison on child pornography convictions. In 2012, Evans pled guilty to attempted aggravated criminal sexual abuse of his 14-year-old niece and being a child sex offender in a school zone and was sentenced to five years in prison. Before his scheduled release, the State petitioned to commit him as a sexually violent person (SVP) under the Sexually Violent Persons Commitment Act (SVP Act or Act) (725 ILCS 207/1 *et seq.* (West 2016)). After a bench trial, the judge declared Evans an SVP and ordered him committed to a secure treatment and detention facility (TDF). Evans appeals, arguing the State failed to prove beyond a reasonable doubt that he was an SVP. He argues the State did not establish (i) he currently has a mental disorder that predisposes him to acts of sexual violence and is either congenital or acquired and (ii) the mental disorder creates a substantial probability he will commit more acts of sexual violence.

¶ 2    We affirm. The State's expert witness presented evidence supporting civil commitment based on his mental disorder and the substantial probability he will reoffend.

¶ 3                                        I. BACKGROUND

¶ 4    In 2014, while Evans was confined to the Illinois Department of Corrections (IDOC), the State petitioned to commit him as a sexually violent person. The case proceeded to a bench trial in May 2019. The State presented Dr. John Arroyo and Dr. Stephen Gaskell as expert witnesses, and Evans presented Dr. Brian Abbott. The experts interviewed Evans and provided consistent testimony about his offenses, which we will summarize. We also will address conduct that did not result in convictions, as the experts testified to its relevance.

¶ 5                                    Evans's Sexual Offenses

¶ 6    In June 1992, Evans, then 21 years old, was charged with disorderly conduct for offering two children money to pose for photographs while they were scantily clad. The prosecutor eventually dropped the case. In April 1993, the police questioned Evans about his habit of taking pictures of young children in the neighborhood but did not charge him with a crime. Evans asked the police how far he could go when taking pictures, and they told him it was illegal, as was touching children. Evans told Dr. Abbott he took pictures of children from a distance and later used them for his sexual arousal.

¶ 7    In August 1993, Evans was charged with four counts of child pornography for luring four girls between the ages of 7 and 13 into his backyard and asking them to pose nude in exchange for money. Evans's neighbors discovered his plan before he could take the pictures and beat him with bats. Evans pleaded guilty and received probation. Evans told Dr. Arroyo that "a little urge" got the best of him, he wished he could apologize to the girls and their families, and this behavior would not happen again.

¶ 8    In 1998, while on probation for the 1993 offense, Evans met a 12-year-old boy at a bus stop and offered him a BB gun in exchange for posing for nude photos. The police found the photos, and Evans pled guilty to one count of child pornography and was sentenced to 10 years in prison.

¶ 9    In 2004, Evans was charged with 15 counts of child pornography after he attempted to download child pornography at a Kinko's store. A store employee alerted the police, who

found Evans had over 100 disks with sexual images of children. The police located additional photos at his home. Evans pled guilty and was sentenced to four years in prison.

¶ 10    In 2007, shortly after his release from prison, Evans attempted to print child pornography from a library printer at Roosevelt University. Evans told Arroyo he downloaded images onto the university printer several times before being caught. Evans pled guilty to child pornography and was sentenced to five years in prison.

¶ 11    In 2011, Evans was charged with attempted aggravated criminal sexual abuse and being a child sex offender in a school zone. Evans's 14-year-old niece was alone in her bedroom when Evans pushed her onto the bed, got on top of her, lifted her shirt, and fondled her stomach. Evans stopped after his niece screamed, and her grandmother (Evans's mother) came home. The niece reported the incident to school officials the next day. Evans went to the school with his mother and was arrested. He pled guilty and received a sentence of five years in prison. Although not related to the charge, the niece also reported Evans sexually abused her when she was four or five years old.

¶ 12    Evans denied he assaulted his niece and said he believed she was retaliating against him for telling her grandmother that she had been home alone with three young men. The experts agreed that a 14-year-old is not considered pre-pubescent for a pedophiliac disorder under the Diagnostic and Statistical Manual of Mental Health Disorders, Fifth Edition (DSM-V) and that Evans went to the school because he and his mother were called there in response to his niece's report of abuse and not because he wanted to see children.

¶ 13                            Experts' Opinions
¶ 14                            *Dr. John Arroyo*

¶ 15    Dr. Arroyo, an expert in clinical psychology with a specialty in sex offender evaluation, testified he examined Evans's master file, including police reports, court records, IDOC records, medical records, and disciplinary history. Arroyo also interviewed Evans in 2014. Arroyo diagnosed Evans with pedophilic disorder, nonexclusive type, sexually attracted to both males and females. "Non-exclusive type" indicates Evans is not exclusively attracted to children, based on his statement that he had fantasies about women.

¶ 16    Arroyo explained that under the DSM-V, pedophilic disorder requires that the individual (i) over a period of at least six months, suffer recurrent and intense fantasies, urges, or behaviors involving sexual activity with pre-pubescent children; (ii) have acted on those urges, or the sexual urges or fantasies must have caused marked distress or interpersonal difficulty; and (iii) have been at least 16 years old and at least 5 years older than the sexual target. Evans met those criteria because (i) he admitted to sexually arousing fantasies and urges involving children between ages 8 and 13 over a period of several years, (ii) he acted on those urges by soliciting children to pose nude while he photographed them, and (iii) he was over 16 and more than 5 years older than his victims.

¶ 17    Arroyo said that during the 2014 interview, Evans admitted to a long history of masturbating to nude photos of prepubescent children between the ages of 8 and 12 and fantasizing about having sex with children, particularly young girls. Evans reported he was aware that taking photos of children was wrong, but his "lustful desires" overcame him. Evans said he no longer suffered from these desires but acknowledged "he is afraid to let those sexual desires into his head again," and he had to stop watching television because he would fantasize

about the young girls he saw on TV. Evans likened his fantasies to "internet pop-ups" but said he could delete them. When Arroyo asked Evans why an adult might engage in sexual activity with a child, Evans said, "Did that child do something to allow the touching? Did they throw themselves on the adult? There is always some kind of reason that would happen." Evans said that "nudity or being around children" is a "high-risk situation" for him.

¶ 18 Arroyo noted that although Evans had minimal disciplinary history in the IDOC and TDF, he had yet to participate in sex offender treatment. This despite being aware that the TDF was a "good call for myself and society" and "psychological treatment" would help stop him from committing another sexual offense. According to Arroyo, although Evans had no convictions for sexual offenses since 2012, he still had pedophilic disorder because "[i]t's not something that can go away on its own, especially without treatment." He stated, "[t]he DSM indicates that an individual's behavior can fluctuate and can increase or decrease *** , but *** [t]here is no remission for pedophiliac disorder."

¶ 19 Arroyo testified that pedophilic disorder constitutes a qualifying mental disorder under the SVP Act. It is a "congenital or acquired condition" because Evans was "either born with the disorder or *** acquired the disorder." The disorder "affect[s] [Evans's] emotional or volitional capacity" because "it affects the way he thinks about engaging in sexual activity with children and those thoughts lead to actions." And the disorder predisposes him to commit acts of sexual violence.

¶ 20 To assess Evans's likelihood to reoffend, Arroyo used two actuarial assessments for sex offenders, the Static-99R and the Static-2002R. Evans scored a 7 on the Static-99R, which placed him in the highest category of "well above average risk." Sex offenders in this category are "four times more likely to reoffend than offenders in the Average risk category." Further, "[a]n individual who scores a 7 on the Static-99R falls in the 97th percentile" and is "5.25 times more likely to reoffend when compared to a typical sex offender." Evans scored a 9 on the Static-2002R, placing him in the "well above average" category. Evans's score placed him in the 98th percentile and predicted he had "6.9 times the risk to be re-convicted or re-arrested for another sexual offense when compared to your typical sex offender." Arroyo opined that Evans's actuarial scores underestimate his risk. Both measures predict "an individual's risk to be re-convicted or re-arrested for another offense, whereas the SVP law is asking whether the individual is going to engage in acts of sexual violence" regardless of whether those offenses would result in prosecution.

¶ 21 Arroyo also considered dynamic and protective risk factors that increase or decrease the chance a person will sexually reoffend. Evans's risk increased due to his (i) sexual preference for children, (ii) supportive attitude towards his offenses, as demonstrated by his justification or excuses for his offenses, (iii) emotional congruence with children, and (iv) lack of positive adult relationships. Arroyo found no dynamic factors, like age, that might lower Evans's risk of reoffending. Instead, he found Evans's age, 48, meant Evans was "in the peak window of offending." Based on all of the factors, Arroyo opined to a reasonable degree of psychological certainty that Evans is "substantially probable to engage in acts of sexual violence" and concluded Evans is an SVP and qualified for civil commitment.

¶ 22 On cross examination, Arroyo acknowledged he had not seen evidence that Evans attempted to obtain child pornography or take pictures of children after his release from the IDOC or that he possessed or created child pornography at the TDF. He also agreed that Evans's scores on the Static-99R and Static-2002R would not change if he were to engage in

treatment, and only reaching age 60 would change his scores.

¶ 23                                                 *Dr. Stephen Gaskell*

¶ 24        Dr. Gaskell testified on behalf of the State as an expert in clinical and forensic psychology and the evaluation of risk analysis for sex offenders. Gaskell examined Evans's master file, which included police reports, court records, IDOC records, mental health records, and sex offender treatment records, as well as his TDF record. Gaskell also interviewed Evans in December 2014 and January 2015. Gaskell diagnosed Evans with pedophiliac disorder, sexually attracted to both, exclusive type. "Exclusive type" means Evans is exclusively attracted to children.

¶ 25        Gaskell testified pedophilic disorder is a mental disorder under the SVP Act and is a congenital or acquired mental condition. Evans met the diagnostic criteria because he (i) has "recorded since age 12 that he had sexual attraction to younger females," (ii) is "attracted to females between the ages of eight and 13 and *** to males between the age of 10 and 12," and (iii) is engaged in behavior "from at least 1992 to 2007, where he would either approach children to take naked pictures of them, or he would take naked pictures of them or he would use child pornography or download child pornography."

¶ 26        Gaskell acknowledged that Evans had not offended since 2011. Still, that did not undermine his conclusions because "[h]e's been locked up in the Department of Corrections and the Department of Human Services where there are no children." Although Evans claimed he "no longer experiences sexual attraction to children," he contradicted that claim by admitting "he was struggling with sexual fantasies of children" and "was able to masturbate to a fantasy to a person he saw on television that was, [he] said, 18 but looked like a little girl." Gaskell also noted Evans has "had exclusive sexual attraction to children since age 18" and "[t]here has been no evidence to suggest that it's changed." Gaskell said pedophilic disorder may increase or decrease but is a "lifelong disorder."

¶ 27        Gaskell opined that Evans's disorder affects his "emotional or volitional capacity" because his "desire for either sexual contact with or to see naked children is sufficiently strong that it overwhelms *** his ability to consider various options and their consequences." Gaskell noted Evans's "pattern of offending is very evident of the lack of control where each time that he is either released from court on probation or released from the Department of Corrections, he has re-offended and oftentimes fairly quickly."

¶ 28        Like Arroyo, Gaskell used the Static-99R and the Static-2002R and considered "other research-based risk factors and protective factors" to assess Evans's risk of committing future acts of sexual violence. On the Static-99R, Gaskell scored Evans as an 8, placing him in the "highest risk range" and in the "99th percentile." (Gaskell's report indicates Evans scored a 7 on the Static-99R, but Gaskell explained during cross-examination he erred in originally scoring Evans.) Evans's score means he is "7.32 times more likely than the average sex offender to commit a future sexual offense." On the Static-2002R, Evans scored a 10, placing him in the 99th percentile. A score of 10 is "associated with being 6.9 times more likely than the average sex offender to commit a future sexual offense."

¶ 29        Gaskell cited factors that increase Evan's risk to reoffend, including his sustained sexual interest in children, employment instability, and noncompliance with supervision as evidenced by his pattern of committing sexual offenses while on parole for previous sexual offenses. Those three factors are "clinically meaningful and show[ ] a statistically significant

relationship to sexual offense recidivism." Gaskell did not find protective factors—like age, health status, or progress in treatment—to lower Evans's risk of recidivism. Based on his risk assessment, Gaskell concluded, "[t]hat it is substantially probable that [Evans] will commit future acts of sexual violence." Because Evans also has a "mental disorder *** that predisposes him to engage in acts of sexual violence," Gaskell concluded Evans is an SVP under the Act.

¶ 30    On cross examination, Gaskell did not know whether Evans's disorder was congenital or acquired. He explained, "I don't know his family history, whether or not, you know, his father had the same disorder or not, or if anyone in his first degree relatives do." Gaskell said Evans denied having been sexually victimized, and Gaskell did not talk to Evans's family members.

¶ 31                                        *Dr. Brian Abbott*

¶ 32    Dr. Abbott, an expert in clinical psychology and specifically in SVP evaluation, diagnosis, and risk assessment, testified on Evans's behalf. Abbott interviewed Evans in 2015 and concluded Evans was not an SVP because he no longer had a mental disorder and was not substantially probable to reoffend. Abbott acknowledged "by convention, psychologists use the DSM-V to determine if someone has [an] acquired or congenital condition" under the SVP Act, and the DSM-V is "used as a way of diagnosing mental disorders in order for people to get treatment." But, evidence of a DSM-V disorder does not mean the person has serious difficulty controlling their sexual behavior or provides information about how the person may act currently or in the future.

¶ 33    Abbott said he believes Evans no longer has a pedophilic disorder, but "clearly" did in the past. Abbott said it "would be grossly insufficient to base a decision on past behavior" because the SVP Act, written in the present tense, requires a finding that the person currently suffers from the congenital or acquired condition. Abbott said Evans "made a commitment to himself" in 2007 to stop sexually fantasizing about children and has not self-reported issues since then. Abbott said Evans's sexual assault on his niece in 2011 did not "count towards pedophilic disorder because there's no indication that she was prepubescent in physical development."

¶ 34    Abbott said Evans showed no signs of the disorder while in the IDOC or the TDF, and, while Evans may have an interest in young children he sees on TV, he can redirect his attention and remind himself of the negative consequences associated with those thoughts. Abbott further said that even if Evans continues to suffer from pedophilic disorder, he has no serious difficulty controlling sexually violent behavior. Abbott disagreed that pedophilic disorder is *per se* a lifelong condition but acknowledged it could be for some people.

¶ 35    Abbott said Evans scored an 8 on the Static-99R assessment, but he did not believe someone with that score was much more likely than not to engage in acts of sexual violence and he could not find other factors that would lead him to believe that Evans would do so.

¶ 36    On cross-examination, Abbott acknowledged that Evans told him he needed to stay away from children and it would be risky to be around them. He also acknowledged Evans might currently have a pedophilic disorder, but "the weight of the clinical evidence suggested it's remitted."

¶ 37    After closing arguments, the trial court found the State proved beyond a reasonable doubt that Evans was an SVP under the Act. The court denied Evans's motion for a new trial and, after a dispositional hearing, committed him for secure care at the TDF.

¶ 38　　　　　　　　　　　　　　II. ANALYSIS

¶ 39　　　　　　　　　　　　　Standard of Review

¶ 40　　When reviewing the sufficiency of evidence claims, we consider whether "viewing the evidence in the light most favorable to the State, any rational trier of fact could find the elements proved beyond a reasonable doubt." *In re Commitment of Fields*, 2014 IL 115542, ¶ 20. Because, as trier of fact, the trial court is responsible for resolving conflicts in the evidence and determining the credibility of the witnesses and the weight assigned particular testimony, we may not substitute our judgment for that of the trier of fact, and we will not reverse its determination unless the evidence is so improbable or unsatisfactory it leaves a reasonable doubt. *In re Detention of White*, 2016 IL App (1st) 151187, ¶ 56.

¶ 41　　To establish a respondent was an SVP under the Act, the State must prove beyond a reasonable doubt (i) the respondent was convicted of a sexually violent offense, (ii) the respondent has a mental disorder, and (iii) the mental disorder creates a "substantial probability" he or she will engage in acts of sexual violence. 725 ILCS 207/15(b)(1)(A), (b)(4), (b)(5) (West 2018). A "mental disorder," as defined by the SVP Act, is "a congenital or acquired condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence." *Id.* § 5(b). Our supreme court "has not given us guidance as to what sort of factual predicate suffices to establish the presence of a mental disorder," in determining whether the State has met its burden. *In re Commitment of Gavin*, 2019 IL App (1st) 180881, ¶ 36. Our appellate courts routinely rely on expert testimony and defer to the factfinder's determinations regarding an expert's credibility. *Id.*

¶ 42　　"A reviewing court will not reverse a [trier of fact's] sexually violent person determination unless the evidence is so improbable or unsatisfactory that it leaves a reasonable doubt," for "[i]t is not the role of the reviewing court to substitute its judgment for that of the trier of fact regarding the credibility of the witnesses or the weight to be given the evidence." *White*, 2016 IL App (1st) 151187, ¶ 56 (citing *In re Commitment of Trulock*, 2012 IL App (3d) 110550, ¶ 48).

¶ 43　　　　　　　　　　Applicability of *People v. Murray*

¶ 44　　Evans does not dispute his conviction for at least one sexually violent offense. Nor does he dispute that the State's expert witnesses, Arroyo and Gaskell, correctly diagnosed him with pedophilic disorder under the DSM-V. He asserts, however, that a diagnosis under the DSM-V does not equate to a "mental disorder" under the SVP Act, and under the requirements set forth in *People v. Murray*, 2019 IL 123289, the State's experts failed to explain how they came to the conclusion that he currently has a mental disorder under the SVP Act for which he (i) is unable to control his behavior and (ii) is dangerous because that mental disorder makes him substantially probable to engage in acts of sexual violence. He contends their failure to explain the reasons for their opinions renders those opinions insufficient for proof beyond a reasonable doubt as a matter of law.

¶ 45　　In *Murray*, the Illinois Supreme Court considered whether an expert's opinion was sufficient to establish the Latin Kings are a street gang under the Illinois Streetgang Terrorism Omnibus Prevention Act (Streetgang Act) (740 ILCS 147/1 *et seq.* (West 2012)), and it determined the expert's opinion was insufficient for proof beyond a reasonable doubt. *Murray*, 2019 IL 123289, ¶¶ 1, 8, 21. The defendant, a member of the Latin Kings, was convicted of possession of a firearm by a street gang member, which required proof he was a member of a

group that engages in a pattern of criminal activity. *Id.* ¶ 22. The State's expert, a police officer, testified he reviewed information from multiple sources of information, and he was familiar with the local Latin Kings and the defendant. *Id.* ¶¶ 25-26. He then opined that the Latin Kings were a street gang under the Streetgang Act without explaining the gang's specific criminal activity. *Id.* ¶ 26-27.

¶ 46    The supreme court reversed the defendant's conviction, holding the expert's testimony was insufficient because Illinois Rule of Evidence 705 (eff. Jan. 1, 2011) "unambiguously requires that [an expert] articulate the reasons for his opinion." *Murray*, 2019 IL 123289, ¶ 31. While an expert is not obligated to bring forth the underlying facts and data on which his or her opinion was premised, just identifying the source of those facts and data without explaining the reasons for the opinion fails to prove the elements of an offense beyond a reasonable doubt. *Id.*

¶ 47    Evans contends he is not asking this court to reweigh the evidence. Rather, he wants us to find the State's experts failed to articulate why they concluded he has a current mental disorder under the SVP Act and is unable to control his behavior. He suggests that the doctors could not provide reasons to support their opinions because the evidence showed he had not engaged in sexual behavior indicative of pedophilic disorder since 2007. "In other words, the doctors could not provide reasons for their opinions because such reasons did not exist." Evans contends, as in *Murray*, the experts' failure to explain the reasons renders their opinions insufficient for proof beyond a reasonable doubt as a matter of law and requires reversal.

¶ 48    We disagree. Arroyo and Gaskell testified Evans has a pedophiliac disorder under the DSM-V. As Evans notes, both witnesses acknowledged a diagnosis under the DSM-V alone does not equate to a finding that a person cannot control his or her behavior, as is required for an SVP finding under the Act. But, contrary to Evans's contention, they did testify, based on their interviews with Evans and their more recent reviews of his records, that Evans's pattern of behavior demonstrated an inability to control his behavior. For instance, Gaskell was asked whether Evans's pedophiliac disorder "affect[s] [his] volitional capacity and seriously impact[s] his ability to control his sexually violent behavior?" He responded in the affirmative and said that

> "[h]is desire for either sexual contact with or to see naked children is sufficiently strong that it overwhelms his ability to consider various options and their consequences. His pattern of offending is very evident of the lack of control where each time that he is either released from court on probation or released from the Department of Corrections, he has re-offended and oftentimes fairly quickly."

Similarly, Arroyo testified the disorder "affect[s] [Evans's] emotional or volitional capacity" because "it affects the way he thinks about engaging in sexual activity with children and those thoughts lead to actions."

¶ 49    Moreover, both witnesses relied on the Static-99R and the Static-2002R and testified Evans's score fell in the highest risk category for both instruments. Evans's score on the Static-99R estimates he is between 5.25 and 7.32 times more likely than the average sex offender to reoffend. And his score on the Static-2002R makes him 6.9 times more likely. Arroyo also testified that the actuarial instruments underestimate Evans's risk because they measure only the likelihood an offender will be reconvicted or rearrested and do not capture undetected or uncharged offenses.

¶ 50       Both experts discussed the dynamic risk factors that increase Evans's likelihood to reoffend, including his sexual preference for children, his supportive attitude towards his offenses, his emotional congruence with children, and his noncompliance with supervision. Neither witness found a factor that lowered Evans's risk. Indeed, Arroyo testified Evans's age put him in the peak window for re-offending. Thus, unlike the expert in *Murray*, who offered an opinion unsupported by facts, Arroyo and Gaskell articulated reasons for concluding Evans suffers from a mental disorder under the SVP Act.

¶ 51                                          Recent Behavior

¶ 52       Evans also contends that, in assessing whether he currently has a mental disorder, the State's experts failed to consider that he has not recently engaged in sexual behavior toward children and his most recent behavior indicates a pedophiliac disorder, namely fantasies about children, was in 2007.

¶ 53       Although Arroyo and Gaskell acknowledged Evans had not reoffended while in custody, Gaskell explained Evans's lack of transgressions while at the IDOC and the TDF make sense because he has no access to children. Courts have consistently upheld SVP findings despite the absence of sexually offensive activity while in the controlled environments of prison or the TDF. *White*, 2016 IL App (1st) 151187, ¶ 60 (citing *In re Detention of Welsh*, 393 Ill. App. 3d 431, 455-56 (2009)).

¶ 54       Gaskell said that, although Evans claimed to have his desires under control, he also admitted to "struggling with sexual fantasies of children" and masturbating "to a fantasy to a person he saw on television" who "looked like a little girl." Gaskell added Evans's "exclusive sexual attraction to children since age 18" and "[t]here has been no evidence to suggest that it's changed." Both experts testified pedophilic disorder as a lifelong disorder that may vacillate but never go away.

¶ 55       Evans asserts that in contrast to the State's expert witnesses, his expert, Abbott, provided reasons why Evans did not have a current mental disorder. Specifically, Abbott testified that he could not identify evidence to support a finding Evans was exhibiting serious difficulty controlling his sexual behavior. Significant to Abbott was Evans's complete lack of institutional signs of pedophilia. Abbott also found Evans was successfully employing interventions to prevent himself from engaging in fantasizing about children and had been doing so since he committed to stop in 2007. According to Evans, Abbott rebutted the notion that pedophiliac disorder is a lifelong disorder. (Though, as noted, on cross-examination, Abbott agreed it is a lifelong disorder for some people.)

¶ 56       Abbott satisfied the requirement set forth in *Murray* to explain the reasons underlying his opinion that Evans does not currently have a mental disorder under the SVP Act. But, as already discussed, the State's expert witnesses, Arroyo and Gaskell, also explained how they concluded Evans does have a mental disorder. The factfinder resolves " 'conflicting testimony by assessing the credibility of the witnesses and determin[ing] the weight to be accorded their testimony.' " *In re Commitment of Sandry*, 367 Ill. App. 3d 949, 979-80 (2006) (quoting *In re Marriage of Murphy*, 359 Ill. App. 3d 289, 302 (2005)). The trial court expressly resolved the competing expert testimony by finding the State's witnesses more credible. We have no basis to question that determination and will not substitute our judgment for the trial court's judgment. *White*, 2016 IL App (1st) 151187, ¶ 56.

¶ 57                          Congenital or Acquired Condition

¶ 58    Evans alternatively argues that the evidence was insufficient to prove he has a mental disorder. Evans maintains that, contrary to the plain language of the statute, the State failed to specify whether his condition was either "congenital or acquired" and then prove to which of these two categories his mental disorder belongs. Evan asserts the plain language of the SVP Act requires the State to prove the origin of the mental condition—congenital or acquired— with specificity. If the State's expert needs to say the "magic words" that a respondent's mental condition is "congenital or acquired" without specifying which it is, that component of the definition of "mental disorder" serves no purpose because the meaning would not change if those words were removed.

¶ 59    This court recently addressed Evans's argument in *In re Commitment of Moody*, 2020 IL App (1st) 190565. Moody, like Evans, argued the experts at his trial "gave only 'canned opinions' that parrot the language of the Act" by testifying that Moody's mental disorder was "congenital or acquired." *Id.* ¶ 47. And Moody similarly argued the evidence was insufficient because "the State failed to specify whether" his mental disorder "was either 'congenital or acquired.' " *Id.* ¶ 54. The appellate court rejected this argument, finding that "[b]ecause the statute does not define either 'congenital' or 'acquired,' the terms must be given their plain and ordinary meaning. *People v. McChriston*, 2014 IL 115310, ¶ 15." *Id.* ¶ 56.

¶ 60    Noting that "congenital" and "acquired" are antonyms, the court concluded that the "most natural reading of the statute is that a mental disorder is any condition affecting the emotional or volitional capacity that predisposes a person to engage in acts of sexual violence, whether congenital or not." *Id.* ¶ 57. This reading aligns with "the intent of the legislature to focus commitment proceedings on persons who have a mental condition that predisposes them towards sexual violence, regardless of the underlying source of that condition." *Id.* Accordingly, "the legislature did not intend to require the State to prove the additional element of 'congenital or acquired.' " *Id.* And because "both experts *** testified that the respondent has a 'congenital or acquired' condition that affects his emotional or volitional capacity in a way that predisposes him to acts of sexual violence," the evidence as to Moody's mental disorder was sufficient. *Id.* ¶ 59.

¶ 61    We agree with *Moody* that under its plain and ordinary meaning, "the Act does not require the State to prove with specificity whether the respondent's mental disorder is 'congenital or acquired.' " *Id.* ¶ 56. Moreover, the evidence was sufficient—the experts testified pedophilic disorder is a "congenital or acquired" disorder and it affects Evans's emotional or volitional capacity in a way that predisposes him to acts of sexual violence.


¶ 62                          Substantial Risk of Reoffending

¶ 63    Evans also challenges the sufficiency of the State's evidence to prove his mental disorder created a substantial probability he would reoffend. See 725 ILCS 207/15(b)(5) (West 2018) (State must prove "[t]he person is dangerous to others because the person's mental disorder creates a substantial probability that he or she will engage in acts of sexual violence"). As used in the SVP Act, " ' " 'substantially probable' " ' " means " ' " 'much more likely than not' " ' " that a respondent will commit acts of sexual violence as a result of his or her mental disorder. *Gavin*, 2019 IL App (1st) 180881, ¶ 43 (quoting *In re Commitment of Haugen*, 2017 IL App (1st) 160649, ¶ 24, quoting *In re Commitment of Curtner*, 2012 IL App (4th) 110820, ¶ 37, and *In re Detention of Bailey*, 317 Ill. App. 3d 1072, 1086 (2000)).

¶ 64    Evans contends that the State failed to prove beyond a reasonable doubt (i) he is substantially likely to reoffend and (ii) his mental disorder caused his risk to reoffend.

¶ 65    As to the likelihood he will reoffend, Gaskell and Arroyo concluded that Evans was substantially probable to reoffend due to his mental disorder. And both testified about facts leading them to that conclusion. As noted, based on the Static-99R and Static-2002R actuarial assessments, Arroyo and Gaskell concluded that Evans fell in the highest risk category, making him between 5.25 and 7.32 times more likely than the average sex offender to reoffend. Arroyo also testified that those instruments underestimate the risk because they only measure the Evans's likelihood of being reconvicted or rearrested and do not account for undetected or uncharged offenses. Both State experts highlighted dynamic risk factors that increase Evan's likelihood to reoffend, including his (i) sexual preference for children, (ii) supportive attitude towards his offenses, (iii) emotional congruence with children, and (iv) noncompliance with supervision. Neither expert found factors that lowered Evan's risk of recidivism.

¶ 66    Like Gaskell, Evan's expert, Abbott, testified that Evans scored an 8 on the Static-99R, but he concluded he could not find extraordinary factors that would lead him to override the actuarial measure in favor of finding Evans much more likely than not to commit a sexually violent offense. Taking all of the experts' testimony and reports in the light most favorable to the State, a rational factfinder could find beyond a reasonable doubt that Evans is substantially probable to commit future acts of sexual violence.

¶ 67    Evans asks us to reweigh the testimony, which we may not do. *Id.* ¶ 39. In an SVP case, we rely "heavily on the conclusions of experts" and defer to the factfinder on expert credibility. *In re Commitment of Montanez*, 2020 IL App (1st) 182239, ¶ 70 (citing *Gavin*, 2019 IL App (1st) 180881, ¶ 36). Two qualified experts concluded that Evans is substantially probable to reoffend, and the trial court properly relied on their testimony in reaching its decision.

¶ 68    We also disagree with Evans's contention that the State failed to prove beyond a reasonable doubt that his mental disorder caused his likelihood to reoffend. Evan cites *Hussung v. Patel*, 369 Ill. App. 3d 924 (2007), a medical malpractice case, for the proposition that correlation and causation are not synonymous. He asserts that although the State's experts established he has a mental disorder, they failed to prove it causes him to have a higher risk of reoffending.

¶ 69    The respondent in *Gavin*, 2019 IL App (1st) 180881, made the same argument, asserting that the State "failed to show it was substantially probable he would reoffend *because of* a mental disorder." *Id.* ¶ 45. In rejecting that argument, the court noted expert testimony that the experts testified a respondent can only be found an SVP if "diagnosed with a mental disorder and *** due to that mental disorder, it is substantially probable that they will engage in future acts of sexual violence." (Emphasis and internal quotation marks omitted.) *Id.* ¶ 50. Thus, "[w]hen reading the experts' conclusions in their proper context," the court concluded "their determinations about Gavin's likelihood to reoffend eminently linked to their conclusions that he had a mental disorder." *Id.*

¶ 70    The court also addressed this argument in *Montanez*, 2020 IL App (1st) 182239. In that case, both experts said Montanez's mental disorder made him substantially probable to reoffend. *Id.* ¶¶ 74-75. Citing *Gavin*, the court found those answers sufficient to connect the mental disorder and the probability to reoffend. The court said "[w]e do not require any specific, precise, or exact testimony to find that an expert sufficiently made the connection between respondent's mental condition and risk of re-offense" and defer to the trial court's

ability "to draw reasonable inferences from witness testimony." *Id.* ¶ 76 (citing *Welsh*, 393 Ill. App. 3d at 455).

¶ 71 And the experts in *Moody* "testified that they were aware of the elements of the SVP Act and opined that, under the SVP Act, the respondent was a sexually violent person." They answered in the affirmative when asked "if the respondent's mental disorders made him substantially probable to commit future acts of sexual violence." 2020 IL App (1st) 190565, ¶ 64. The court, citing *Gavin*, held "the expert's testimony clearly linked the respondent's substantial probability of reoffending to his mental disorders." *Id.*

¶ 72 Evans argues that *Gavin* and *Montanez* are not dispositive because (i) they did not foreclose the availability of this argument, but only found the State had met its burden, and (ii) *Gavin* preceded the supreme court's decision in *Murray*. Both statements are accurate but provide no basis for reversing the trial court's findings. Arroyo and Gaskell testified about the requirements of the SVP Act and concluded that Evans met them. They also opined that his mental disorder makes him substantially probable to engage in acts of sexual violence. As in *Gavin*, *Montanez*, and *Moody*, the experts' testimony, when viewed in context, plainly linked Evan's substantial probability to reoffend to his mental disorder and satisfied the requirements set out in *Murray*.

¶ 73 Affirmed.