# Illinois Official Reports

## Appellate Court

---

### *People v. Baker*, 2021 IL App (3d) 190618

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL J. BAKER, Defendant-Appellant. |
| District & No. | Third District<br>No. 3-19-0618 |
| Rule 23 order filed<br>Motion to<br>publish allowed<br>Opinion filed | July 28, 2021<br><br>August 20, 2021<br>August 20, 2021 |
| Decision Under Review | Appeal from the Circuit Court of Knox County, No. 18-CF-294; the Hon. Scott Shipplett, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Karalis, Mark Fisher, and Adam Bukani, of State Appellate Defender's Office, of Ottawa, for appellant.<br><br>Jeremy Karlin, State's Attorney, of Galesburg (Patrick Delfino, Thomas D. Arado, and Nicholas A. Atwood, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

JUSTICE LYTTON delivered the judgment of the court, with opinion. Justices Daugherity and Wright concurred in the judgment and opinion.
Justice Wright also specially concurred, with opinion.

**OPINION**

¶ 1    Defendant, Daniel J. Baker, was charged with eight counts of unlawful possession of child pornography, alleging that he possessed lewd digital images of girls who he knew or reasonably should have known to be under the age of 13. 720 ILCS 5/11-20.1(a)(6), (c-5) (West 2018). Prior to trial, defendant filed a motion to suppress images police officers obtained from a micro-SD card belonging to him. Following a hearing, the trial court denied defendant's motion to suppress. The State moved to dismiss all but one of the counts of unlawful possession of child pornography, and the case proceeded to a stipulated bench trial. The trial court found defendant guilty and sentenced him to 30 months of probation. Defendant appeals, arguing that (1) the trial court erred in denying his motion to suppress and (2) the State failed to prove him guilty beyond a reasonable doubt. We affirm.

¶ 2                                    BACKGROUND

¶ 3    On June 1, 2018, defendant was charged with eight counts of unlawful possession of child pornography. Each count alleged that defendant

"possessed a digital image of a child whom the defendant knew or reasonably should have known to be under the age of thirteen (13), which depicted or portrayed in any pose, posture, or setting a lewd exhibition of the unclothed genitals, pubic area, buttocks or fully or partially developed breasts of a minor female child."

The images were found on a micro-SD card belonging to defendant.

¶ 4    Defendant filed a motion to suppress the images contained on the micro-SD card, alleging that the card was seized in an illegal, warrantless search. The trial court held a hearing on defendant's motion to suppress.

¶ 5    At the hearing, Magdalene Semington, a patrol officer for the City of Galesburg, testified that she met with Jesse Pickrel on the morning of June 1, 2018, at the police station. Pickrel told Semington that he was at the home of his friend, Elizabeth Baker, and she showed him a micro-SD card that belonged to her husband, defendant, which contained child pornography. According to Pickrel, defendant had problems in the past "looking at pictures of naked juveniles." Approximately 30 minutes after learning about the micro-SD card and its contents, Semington, along with Detective Todd Olinger, went to Elizabeth and defendant's apartment.

¶ 6    When Semington and Olinger arrived at the apartment, Elizabeth opened the door and whispered that defendant was home. When Semington asked about the micro-SD card, Elizabeth said defendant had been aggressive with her in the past and she feared he would harm her. As a result, Semington and Olinger devised a plan to remove defendant from the apartment by saying they received a call about a domestic complaint.

¶ 7    Olinger asked defendant to step outside with him. Once defendant was outside, Elizabeth retrieved the micro-SD card from a high shelf by standing on a chair and gave it to Semington.

Elizabeth did not want defendant to know that she gave Semington the micro-SD card or that she was cooperating with the police because she feared defendant would hurt her.

¶ 8    Semington denied threatening Elizabeth. Semington admitted telling Elizabeth she could be "arrested for obstructing" but only said that so defendant would not know Elizabeth was cooperating with her. Elizabeth never indicated that she was unwilling to cooperate or give the micro-SD card to Semington. Semington admitted she never asked defendant for the micro-SD card even though she knew it was his.

¶ 9    Elizabeth testified that she has been married to defendant since 2013. She and defendant have two children together. When police officers came to her apartment on June 1, 2018, asking about a micro-SD card, she knew what the officers were referring to because she found the card a few days earlier. The card belonged to defendant. Elizabeth told the officers she was "a little nervous" about retrieving the card because defendant was home. She also said she was not sure she wanted to give the officers the card because she did not want defendant to be arrested. According to Elizabeth, the officers told her that if she did not give them the micro-SD card, they could obtain a search warrant and arrest her for refusing to cooperate. When Elizabeth asked what would happen to her children if she were arrested, the officers said they could be taken away and placed in foster care. Elizabeth was scared because of what the officers said and decided to retrieve the card and give it to the officers.

¶ 10    While the officers talked to defendant outside, Elizabeth went inside the apartment and retrieved the micro-SD card. When Elizabeth came back outside, the officers told defendant to go inside, and Elizabeth gave them the card.

¶ 11    Elizabeth testified that she is still married to defendant. When defendant found out how the police obtained the micro-SD card, he was upset with Elizabeth but forgave her. Elizabeth said that when she found the card, "I couldn't go to the police myself because it was my husband. *** So one of my friends did it for me."

¶ 12    Olinger, who was a detective with the City of Galesburg on June 1, 2018, testified that he went with Semington to Elizabeth and defendant's apartment on June 1, 2018. After the officers knocked, Elizabeth opened the door, and the officers asked her to step outside. The officers then asked Elizabeth to bring them the micro-SD card she had found and shown to Pickrel.

¶ 13    According to Olinger, Elizabeth was "cooperative" and "friendly" but said she did not want to retrieve the card in front of defendant because she was scared of him. Olinger asked defendant to step out of the apartment. When he did so, Olinger talked to defendant about an alleged domestic dispute. Defendant admitted that he and Elizabeth had a "dispute" earlier that day. Olinger never told defendant that he and Semington were there for his micro-SD card. Olinger denied that he or Semington told Elizabeth that her kids could be taken away or that she could be criminally charged if she did not cooperate with them.

¶ 14    The trial court denied defendant's motion to suppress, finding the testimony of Semington and Olinger more credible than Elizabeth's testimony. The court further ruled that Elizabeth had authority to give consent to the officers to search anything in the apartment because she lived there.

¶ 15    On June 17, 2019, the parties informed the court that they had reached an agreement requiring the State to dismiss seven of the eight counts of unlawful possession of child pornography against defendant in exchange for a stipulated bench trial on the one remaining

count. At the stipulated bench trial, the prosecutor stated that the evidence would show that on June 1, 2018, Pickrel told officers that he saw Elizabeth put a micro-SD card into a tablet and saw images of young nude females. Pickrel reported what he saw to police. As a result of that report, officers went to defendant's residence, and Elizabeth gave the officers the micro-SD card. Officers observed eight sexually explicit images of nude females under the age of 13 on the card. Officers obtained a search warrant and arrested defendant. When officers interviewed defendant, he said there were 40 pornographic images of children on the card. Officers executed a search warrant and found 400 images on the micro-SD card.

¶ 16  The State provided a copy of one image contained on the micro-SD card to the trial court. The image shows a completely nude young girl sitting on the floor of a carpeted room. One of her legs is on the ground fully bent and the foot of that leg is tucked under the thigh of her other leg, which is also on the floor and bent at a 90-degree angle. The child's bare vagina is visible. The girl is staring straight ahead with her eyes open. She has long hair, which partially covers her chest, but both of her nipples are uncovered. The girl's breasts are undeveloped, she has no pubic hair, and she lacks muscle tone. On the floor to the left of the girl is a stuffed animal and on a table behind her are a children's book and a small animal statue. In the bottom left-hand corner of the image is the word "naughty." The trial judge stated he looked at the image for "one-half of a second" and "figure[d] out" that the image was "child pornography." He described the photo as "a prepubescent female child completely naked."

¶ 17  The trial court found defendant guilty and sentenced him to 30 months' probation. Defendant filed a motion for a new trial, which the trial court denied.

¶ 18                                ANALYSIS
¶ 19                          I. Motion to Suppress
¶ 20  Defendant first contends that the trial court erred in denying his motion to suppress evidence. He argues that the trial court should have suppressed all evidence obtained from the micro-SD card because police obtained it in violation of his fourth amendment rights.

¶ 21  A ruling on a motion to suppress is subject to a mixed standard of review. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). The trial court's factual findings are entitled to deference, given that the trial court is in a superior position to weigh the credibility of witnesses, and we will uphold such findings unless they are contrary to the manifest weight of the evidence. *Id.* However, the ultimate legal question of suppression is subject to *de novo* review. *Id.*

¶ 22  The fourth amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV; accord Ill. Const. 1970, art. I, § 6 ("The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devises or other means."). Reasonableness generally requires a warrant supported by probable cause. *People v. Anthony*, 198 Ill. 2d 194, 201-02 (2001) (citing *Katz v. United States*, 389 U.S. 347, 357 (1967)). However, "[a] well-settled, specific exception to the fourth amendment's warrant requirement is a search conducted pursuant to consent." *Pitman*, 211 Ill. 2d at 523.

¶ 23  Consent need not be given by the defendant; it may be obtained "from a third party who possesses common authority over the premises." *Id.* (citing *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). Under the common-authority rule, a defendant assumes the risk that someone

with joint access or control over property has the right to permit a search of it. *People v. Miller*, 346 Ill. App. 3d 972, 985 (2004). "Common authority may be 'actual' or 'apparent.' " *Id.* "[A]ctual authority" (emphasis omitted) is "[a]uthority that a principal intentionally confers on an agent, including the authority that the agent reasonably believes he or she has as a result of the agent's dealings with the principal." Black's Law Dictionary 127 (7th ed. 1999). In assessing whether apparent authority exists, the court determines "whether the circumstances known to the police at the time of the entry or opening would warrant a person of reasonable caution in the belief that the consenting party had authority over the premises or effects." *Miller*, 346 Ill. App. 3d at 986 (citing *Rodriguez*, 497 U.S. at 188-89). The State has the burden of proving by a preponderance of the evidence that valid consent was given. *Id.*

¶ 24      "Under Illinois law, proof that spouses have common authority over a space is, without more, rebuttable proof that each spouse has authority not only over containers within that space that are jointly owned or used by the spouses, but also over containers owned or in practice used by one spouse alone." *People v. Lyons*, 2013 IL App (2d) 120392, ¶ 33. The presumption arises solely from the existence of common authority over the space itself; it does not require the State to prove that the spouse who solely owns or uses the container has expressly authorized the other spouse to access it. *Id.* It is the defendant's burden to rebut this presumption. See *id.* ¶ 37. "In the case of spouses *** proof of sole ownership or use of a container by the nonconsenting spouse does not alone overcome the presumption of common authority." *Id.*

¶ 25      In *Lyons*, the Second District held that the defendant's wife (Lyons) had authority to consent to the warrantless search of computer disks belonging to the defendant that were in a locked cabinet used exclusively by the defendant to which both the defendant and his wife had keys. *Id.* ¶¶ 31-38. The court stated:

> "Since *** Lyons had access to the cabinet containing the disks, and defendant did not restrict her access to the contents of the disks, whether by security measures or directives to her, defendant assumed the risk that Lyons would view the disks herself or permit another to do so. Lyons, therefore, had authority to consent to a search of the disks." *Id.* ¶ 38.

¶ 26      While consent by one resident of a jointly occupied premises is generally sufficient to justify a warrantless search, a search is unlawful if a physically present cohabitant expressly refuses to consent. *Georgia v. Randolph*, 547 U.S. 103, 122-23 (2006). This rule applies only when "a potential defendant with self-interest in objecting is in fact at the door and objects." *Id.* at 121. If a potential objector is nearby but does not object, he "loses out" unless there is evidence that the police have removed him from the property solely "for the sake of avoiding a possible objection." *Id.* If a defendant is removed from his property by police who have reasonable grounds to do so, consent by a co-resident is sufficient. *Fernandez v. California*, 571 U.S. 292, 302-03 (2014). Reasonable grounds for removing a defendant from his apartment include allowing officers to speak with a potential domestic violence victim outside of the defendant's "potentially intimidating presence." *Id.* at 303.

¶ 27      Finally, although a third party's common authority gives her power to consent to a search, it does not give her power to consent to the government's seizure of an item in which she has no ownership interest. See *People v. Blair*, 321 Ill. App. 3d 373, 380 (2001). "[A] seizure is lawful only when the owner of the property consents to the seizure, there is a valid warrant for its seizure, or police are lawfully present and there is probable cause to believe the property is

contraband, stolen property, or evidence of a crime." *Id.* A police officer has probable cause to seize an item where the facts available to the officer would justify a person of reasonable caution to believe that the item may be contraband, stolen property, or evidence of a crime. *Id.* at 377 (citing *Texas v. Brown*, 460 U.S. 730 (1983)).

¶ 28    Here, officers went to the apartment of defendant and his wife, Elizabeth, to obtain the micro-SD card belonging to defendant, which, according to Pickrel, contained child pornography. Officers obtained the card from Elizabeth who had common authority over the apartment she shared with defendant. See *Lyons*, 2013 IL App (2d) 120392, ¶ 24. Because of Elizabeth's common authority, a rebuttable presumption arose that Elizabeth could consent to the search of everything in the apartment, including defendant's micro-SD card. See *id.* ¶ 33. To rebut that presumption, defendant had to do more than assert his mere ownership of the micro-SD card; he had to show that he restricted Elizabeth's access to the place where the card was found or the card itself. See *id.* ¶¶ 37-38. Defendant failed to do so. To the contrary, the evidence showed that Elizabeth retrieved the card for police from a shelf that was accessible to her. Thus, Elizabeth had common authority over the card and could consent to the police searching it.

¶ 29    Nevertheless, we must decide if the police officers' removal of defendant from the apartment invalidated an otherwise lawful search. Defendant contends that the only reason Semington and Olinger removed him from the apartment and talked to him outside was to prevent him from objecting to their search and seizure of his micro-SD card. We disagree. Here, the evidence establishes that when Officers Semington and Olinger asked Elizabeth for the micro-SD card, she said she did not want to retrieve it and hand it over to the officers in front of defendant because she feared he may become physically violent with her, as he had done in the past. Based on Elizabeth's statements, the officers devised a plan to remove defendant from the apartment so Elizabeth could obtain the card and provide it to the officers outside of defendant's presence. The purpose of removing defendant from the apartment was not to prevent his objection to the officers' search but to protect Elizabeth from defendant and ensure her safety. Because the officers had reasonable grounds to remove defendant from the apartment property, the search was valid. See *Fernandez*, 571 U.S. at 302-03. However, that does not end our fourth amendment analysis because the police not only searched the card but seized it by removing it from defendant and Elizabeth's apartment.

¶ 30    While common authority justifies a warrantless search, it does not authorize seizure of an item. See *Blair*, 321 Ill. App. 3d at 380. However, "[i]f police discover an item during a lawful search (such as a search pursuant to consent), they may seize it only if they have probable cause to believe it is contraband or evidence of a crime." *People v. Raibley*, 338 Ill. App. 3d 692, 700 (2003). Based on Pickrel's statements to Semington at the police station that the micro-SD card contained "pictures of naked juveniles," the police had probable cause to believe the micro-SD card contained child pornography. Therefore, police were justified in seizing the card as evidence of a crime. See *id.*

¶ 31    For these reasons, the search and seizure of defendant's micro-SD card was lawful, and the trial court properly denied defendant's motion to suppress.

¶ 32                              II. Sufficiency of the Evidence

¶ 33        Defendant also argues that the evidence was insufficient to prove him guilty beyond a doubt because the image the State introduced was not "lewd," and no evidence was presented to show that the child in the photograph was under 13 years of age.

¶ 34        Where a criminal conviction is challenged based on insufficient evidence, a reviewing court, considering all the evidence in the light most favorable to the prosecution, must determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime. *People v. Brown*, 2013 IL 114196, ¶ 48. To convict a person of a Class 2 felony of possession of child pornography, the State must prove beyond a reasonable doubt that (1) the defendant possessed a photograph of a child who he knew or reasonably should have known was under the age of 13 and (2) the child was depicted or portrayed in a pose, posture, or setting involving a lewd exhibition of her unclothed genitals, pubic area, buttocks, or breasts. See 720 ILCS 5/11-20.1(a)(1)(vii), (a)(6), (c-5) (West 2018).

¶ 35        Our supreme court has enumerated six factors for courts to consider in determining whether an image of a child is "lewd." See *People v. Lamborn*, 185 Ill. 2d 585, 592 (1999). Those factors are as follows:

> "(1) whether the focal point of the visual depiction is on the child's genitals; (2) whether the setting of the visual depiction is sexually suggestive, *i.e.*, in a place or pose generally associated with sexual activity; (3) whether the child is depicted in a unnatural pose, or in inappropriate attire, considering the age of the child; (4) whether the child is fully or partially clothed, or nude; (5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity; and (6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer. *Id.*

A photograph need not satisfy all the listed factors to be considered lewd. *Id.* A court's determination of lewdness should be made on a case-by-case basis in light of an image's overall content, taking into account the age of the child. *Id.* at 592-93. A trial court's determination that an image is "lewd" within the meaning of the child pornography statute is reviewed *de novo*. *Id.* at 590.

¶ 36        The trier of fact is vested with the responsibility of determining the age of the child depicted in material that constitutes child pornography. *People v. Schubert*, 136 Ill. App. 3d 348, 353 (1985); 720 ILCS 5/11-20.1(c-5) (West 2018). A court does not need testimony from an expert to make such a determination. See *People v. Thomann*, 197 Ill. App. 3d 488, 499 (1990). A court can rely on its own observations and experiences in assessing the age of a child. *Id.*; *Schubert*, 136 Ill. App. 3d at 354. "A prepubescent child's undeveloped physical features will, by themselves, provide notice of the child's age ***." *State v. Mole*, 149 Ohio St. 3d 215, 2016-Ohio-5124, 74 N.E.3d 368, ¶ 66.

¶ 37        Here, the trial court quickly examined the image found on defendant's micro-SD card and determined that it constituted a "lewd" exhibition of a child under the age of 13. Based on our review of the *Lamborn* factors, we agree.

¶ 38        First, based on the angle at which the child is sitting with one leg bent underneath and at a different angle than her other leg, the child's exposed vagina appears to be the focal point of the image; thus, the first factor is satisfied. See *People v. Knebel*, 407 Ill. App. 3d 1058, 1059 (2011) (if the position of the child and angle of the photograph put the child's exposed vaginal area in the forefront of the photograph, this factor is met). Next, the photograph appears to

have been taken inside a house in a room containing minimal furniture and some items appropriate for children, including an animal statue, a children's book, and a stuffed animal. Nothing about the physical setting of the photo appears to be sexually suggestive, so the second factor is not met.

¶ 39    Turning to the third factor, the child is sitting in an unnatural position that seems intended solely to expose her naked body, particularly her vagina, to the viewer; therefore, this factor is satisfied. See *id.* at 1060 (third factor met where child is naked and her vagina is prominently displayed for the camera). Additionally, the child is entirely nude, and while her hair is long enough to cover her undeveloped breasts, it is styled in a way that makes a portion of her breasts and the nipples of both breasts visible, satisfying the fourth factor.

¶ 40    With respect to the fifth factor, "there should be evidence, whether 'by gesture, facial expression, or pose, that the subject of the photograph displayed a willingness to engage in sexual activity.' " *People v. Wayman*, 379 Ill. App. 3d 1043, 1057 (2008) (quoting *United States v. Villard*, 885 F.2d 117, 124 (3d Cir. 1989)). While the child's blank facial expression does not suggest coyness, that the child appears to be looking directly at the camera and is sitting with her legs partially open and her genitals exposed, makes her appear willing to engage in sexual activity, satisfying the fifth factor. See *Knebel*, 407 Ill. App. 3d at 1060 (child "with her legs slightly open while looking directly at the camera" appeared "inviting and willing to engage in sexual activity").

¶ 41    Finally, regarding the sixth factor, we must consider "whether the image invites the viewer to perceive the image from some sexualized or deviant point of view." *People v. Sven*, 365 Ill. App. 3d 226, 238 (2006). This factor is satisfied because the presence of objects intended for a young child in the room with the girl and the word "naughty" on the image invite the viewer to perceive the photograph from a sexualized and deviant point of view. See *State v. Hunt*, 346 P.3d 1285, 1287-89 (Or. Ct. App. 2015) (defendant asking child to send him a " 'naughty' " picture of herself was sufficient to establish defendant "had attempted to 'permit' [child] to engage in sexually explicit conduct").

¶ 42    Here, five of the six factors weigh in favor of finding the image is "lewd" for purposes of the child pornography statute. Considering these factors as well as the tender age of the victim, we agree with the trial court's conclusion that the image is "lewd."

¶ 43    Finally, the evidence was sufficient to establish that the girl in the photograph was under 13 years of age. The child pornography statute states that "[t]he issue of whether the child depicted is under the age of 13 is an element of the offense to be resolved by the trier of fact." 720 ILCS 5/11-20.1(c-5) (West 2018).

¶ 44    Here, the trial court found, based on everyday observations and experiences, that the girl in the photo was under 13 years of age, describing her as "prepubescent." See *In re Detention of Hughes*, 346 Ill. App. 3d 637, 642-43 (2004) (expert forensic psychiatrist defining "prepubescent" as "before the age of 12"); *In re Care & Treatment of Sebastian*, 556 S.W.3d 633, 648 (Mo. Ct. App. 2018) (expert clinical psychologist testified that "anyone under the age of 13 qualified as prepubescent"); see also *People v. Masterson*, 207 Ill. 2d 305, 307, 315 (2003) (finding 12-year-old girls prepubescent); *In re Commitment of Evans*, 2021 IL App (1st) 192293, ¶ 17 (describing children between the ages of 8 and 12 as "prepubescent"). We agree with the trial court that there is sufficient evidence to support the conclusion that defendant knew or should have known that the girl in the photograph was under 13 years of age because "[t]he physical immaturity of a prepubescent child is obvious." See *Mole*, 2016-Ohio-5124,

¶ 66. The child in the photo had physical characteristics, such as undeveloped breasts, no body hair, and a lack of muscular development, establishing that she was under the age of 13. See *Schubert*, 136 Ill. App. 3d at 354; see also *People v. Jaynes*, 2014 IL App (5th) 120048, ¶ 9 (prepubescent girls lack breast development and pubic hair); *Gerron v. State*, 524 S.W.3d 308, 317, 326 (Tex. Crim. App. 2016) (expert in child anatomy testified that "a girl with no breast tissue or breast development would be considered a prepubescent child"). The evidence was sufficient to support defendant's conviction of the Class 2 felony of possession of child pornography.

¶ 45                                                    CONCLUSION

¶ 46        For the foregoing reasons, the judgment of the circuit court of Knox County is affirmed.

¶ 47        Affirmed.

¶ 48        JUSTICE WRIGHT, specially concurring:

¶ 49        The majority concludes the officers asked defendant to step outside the apartment for reasons that were not designed to prevent defendant from objecting to the seizure of the micro-SD card. I agree.

¶ 50        I write separately to express my view that the officers not only asked defendant to step outside the apartment in order to protect Elizabeth from harm but did so with the intent to maintain a nonthreatening environment while Elizabeth decided whether or not to protect defendant or to cooperate with law enforcement. In fact, once she freely made her decision, Elizabeth felt safe enough to assist the investigation by directing the officers to the location of the pornography.

¶ 51        Not unexpectedly, Elizabeth has now reconsidered her decision to cooperate with law enforcement. Perhaps Elizabeth's change of heart is the result of subsequent but coercive pressure from defendant that the choices made by the officers successfully avoided on the day of the search.

¶ 52        For these reasons, I specially concur.